**UNITED STATES of America,**

v.

**Raymond ROBIN, Defendant.**

**No. 74 CR. 622.**

United States District Court,
S. D. New York.

Dec. 2, 1976.

Robert B. Fiske, Jr., U. S. Atty., Southern District of New York by Dominic F. Amorosa, Asst. U. S. Atty., New York City, for the United States.

Jack L. Cohen, Greenberg & Margolis, P. A., East Orange, N. J., for defendant.

MOTLEY, District Judge.

## OPINION

Defendant was charged in the instant indictment, filed in this court on June 20, 1974, with conspiracy to distribute heroin and with distributing one-half a kilogram of heroin on each of two separate occasions in March of 1974.[1] The indictment alleged that he received a total of $27,000 for these two sales. The indictment remained sealed until May 1, 1975 when it was unsealed and assigned to this judge for all purposes. Trial of the indictment was scheduled for November 10, 1975.

On March 28, 1974, prior to the federal indictment, defendant had been indicted by a New York State grand jury, which charged him with violations of the state's narcotics laws with respect to the same transactions. Immediately upon his arrest on the state charges on April 1, 1974, defendant agreed to cooperate with both state and federal authorities. About 18 months later, the authorities became dissatisfied

with defendant's cooperation. A superseding indictment was returned in the state court on October 3, 1975 charging the same substantive violations but widening the scope of the conspiracy charged. Defendant moved to dismiss the state charges on the ground that he had been promised that in return for his cooperation the state charges would be dismissed and he would be permitted to plead to the federal indictment. The state court held a hearing on the motion in early November 1975.

Defendant appeared on November 10, 1975, the date set for trial of the instant indictment without his counsel and advised the court clerk that he opposed the Government's motion to dismiss the instant indictment. The Government had advised the clerk that it desired to nolle "prosequi" the indictment. The trial could not proceed on November 10, as scheduled, since this judge was involved in the trial of another criminal case at that time. Defendant was advised to return with his lawyer.

On November 12, 1975 defendant appeared with his counsel, Jack Cohen, who advised that defendant desired to withdraw his previously entered pleas of not guilty to Counts 2 and 3 of the indictment and plead guilty.[2] The Government advised that it desired to nolle "prosequi" the entire indictment that day.[3] Addressing the court the Government counsel said:

"The background on this case is that in June of 1974 Mr. Robin was indicted here in three counts. About that time he was also indicted by a State Grand Jury for similar crimes. Mr. Robin was indicted by both the State and the Federal Grand Juries and we wanted to give him an opportunity, if he cooperated in good faith, to plead to the Federal charges and the State charges thereupon would have been dismissed.

"Mr. Robin has not cooperated in good faith with the Federal Government and with the State authorities with respect to narcotic matters about which he has

---

1. 21 U.S.C. §§ 846, 812, 841(a)(1) and 841(b)(1)(A).

2. Transcript of 11/12/75, p. 2.

3. Id. pp. 2–3.

knowledge and based on the failure to cooperate with us in full and in good faith, we at this time ask your Honor's permission to grant the Government the right to nolle this indictment so that Mr. Robin may go to trial on November 24 of this year before the State Court, before one of the State Court Judges in connection with a narcotics conspiracy and substantive counts and that is our position in substance."

In addition, the Government's counsel charged that defendant was a major heroin violator.[4]

Defense counsel disputed the Government's claim that defendant was a major violator and vigorously opposed the motion to dismiss. He requested a factual and legal hearing which was granted.[5] The Government's counsel then inquired what defense counsel intended to do about Count 1, since it was the Government's intention to try defendant on Count 1 and other charges, even if the plea to Counts 2 and 3 be accepted.[6] In reply defense counsel said: "I would say to the Government through the Court if they withdraw their application to nolle pros and permit us to plead we would plead guilty to all three counts."[7] To this the Government replied: "We do not withdraw our application to dismiss this indictment."[8]

Each side was allowed 10 days to file briefs and formal motions.

Defense counsel thereafter filed a motion for leave to enter a plea of guilty to all counts of the instant indictment. In connection therewith defendant filed a 48 page brief. A large envelope, containing the following documents, was submitted and designated Appendix to Brief:

(a) *State vs. Ray*, indictment no. N529–129–74.

(b) *United States of America vs. Raymond Robin*, indictment no. 74 Cr. 622.

(c) *State vs. Robin*, indictment no. N1161–594/75.

(d) Federal waiver of speedy arraignment, dated April 1, 1974.

(e) State waiver of speedy arraignment, undated.

(f) United States Attorney's notice of readiness for trial.

(g) Investigation reports, Drug Enforcement Administration, United States Department of Justice.

(h) Transcript of testimony on 'Huntley Hearing', October 27, 1975, *State vs. Ray Robin*, before Honorable Richard G. Denzer, J.S.C.

(i) *State vs. Ray Robin*, Defendant's Memorandum of Law in Support of Motion to Dismiss State Indictment.

(j) *United States of America vs. Raymond Robin*, transcript of proceedings, November 12, 1975 before the Honorable Constance Baker Motley.

All of these documents were filed in Chambers rather than the Clerk's office apparently because the Clerk's office was closed on Saturday at 5:00 P.M. on November 22, 1975, the time when briefs from both sides were due.

The Government's counsel submitted an affidavit, sworn to November 21, 1975. No brief was submitted. However, the affidavit, in addition to alleging that the Government regarded defendant as a major heroin dealer, contained the Government's argument and citation of authorities. In its affidavit, the Government argued that defendant's cooperation with the authorities was not in good faith (at p. 2). The Government also argued that "[d]efendant's true purpose in attempting to plead guilty in federal court is to thereby preclude the state prosecution against him as a disposition in federal court of narcotics criminal charges identical with then pending state

---

4. Id. p. 5.

5. Id. pp. 7–10.

6. Id. p. 15.

7. Id. pp. 10, 16.

8. Id. p. 16.

charges is, as a matter of New York State law, a bar to a subsequent state prosecution on those charges." (at p. 4).

In his brief defendant argued that the only reason for the Government's desire to dismiss the instant indictment was "a joint decision by federal and state authorities to expose the defendant to a far harsher state penalty scheme which is available under the so-called Rockefeller drug program in New York State." [9]

The brief continued: "In this highly unusual situation, there is no clear precedent to guide the Court. As a matter of sound policy the law would seem, however, to favor guilty pleas over dismissals as alternative ways of terminating proceedings initiated by a federal grand jury with the then full support of the United States Attorney's offices." [10]

The court held a hearing on the motion on November 25, 1975. In addition to permitting Mr. Cohen to argue on behalf of defendant, the court permitted Steven Givis, the author of defendant's thorough and able brief to argue on behalf of defendant. The argument lasted almost 1½ hours.[11] The court then recessed to consider the matter. It decided to accept the plea. The court rendered a brief oral opinion.[12] It concluded that defendant had the right to plead to all counts of the indictment pending against him and that denial of the offer

to plead to the entire indictment by granting the Government's motion to dismiss would serve no criminal law objective other than to expose defendant to what the Government conceived to be a more severe sentence possibility than defendant's maximum possible exposure in this case.[13] The Government agreed that the defendant's maximum exposure here was 45 years in prison with a minimum mandatory parole period of at least three years following imprisonment and $75,000 in fines. If convicted in the state court, the judge would have been required to sentence defendant to 15–25 years to life in prison.

Defendant had argued that before dismissal of the indictment, defendant should be entitled to a full plenary hearing so that his interests in opposing the dismissal would be protected and the facts explored; but if the court accepted defendant's guilty plea on the papers submitted, no further hearing of the motion then before the court would be required beyond the normal Rule 11 hearing for the tender of a guilty plea.[14]

The hearing on defendant's plea lasted approximately one hour and fifteen minutes. The plea was taken shortly after the hearing on the Government's motion to dismiss and defendant's motion to plead guilty.[15] During the course of the voir dire of defendant, the court addressed defendant, in part, as follows:

**9.** Defendant's Memorandum of Law In Support of Defendant's Motion For Leave To Enter Plea of Guilty To All Counts Of Indictment And In Opposition To The Government's Brief For Leave To Dismiss. p. 3.

**10.** Id.

**11.** Transcript of Hearing, 11/25/76 at 5:00 P.M.

**12.** The court had intended to write an opinion denying the motion to dismiss the instant indictment, but when the Government abandoned its decision to appeal this court's ruling the court did not proceed with the writing of the opinion. See additional transcript of proceedings at 5:00 P.M. 11/25/75 transcribed on 11/30/76.

**13.** Id. See *United States v. Ammidown*, 162 U.S.App.D.C. 28, 497 F.2d 615, 620 (1973); *Woodring v. United States*, 311 F.2d 417, 424 (8th Cir.) *cert. denied* 373 U.S. 913, 83 S.Ct.

1304, 10 L.Ed.2d 414 (1963); *United States v. Cox*, 342 F.2d 167, 171 (5th Cir. en banc), *cert. denied, Cox v. Hanberg*, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965); *United States v. Greater Blouse, Skirt & Neckwear Contractors Ass'n*, 228 F.Supp. 483, 486 (S.D.N.Y.1964). Wright, Federal Practice and Procedure, § 812, p. 304. Rule 48(a) Federal Rules of Criminal Procedure. Tr. of 11/25/75 at 5:00 P.M. pp. 27–28. Rule 11, Federal Rules Criminal Procedure. *See City of Burbank v. General Electric Company*, 329 F.2d 825, 835 (9th Cir. 1964).

**14.** Defendant's Memorandum of Law In Support of Defendant's Motion For Leave To Enter Plea of Guilty To All Counts Of Indictment And In Opposition To The Government's Brief For Leave To Dismiss. pp. 3–4.

**15.** Transcript of Plea Hearing 11/25/75 at 6:30 P.M.

"Q And how much education have you had?

A Two years of college.

Q Where did you go to college?

A New York University.

Q And when did you finish college?

A I believe it was in 1951.

Q You spent two years at New York University, here in the City of New York?

A Yes, your Honor.

Q Where did you go to high school?

A DeWitt Clinton, and I went to Taft High School, in the Bronx.

Q When did you finish high school?

A In 1948. When I finished Service. I went into the Service in 1944. I left high school prior to graduating and went into the Service, and when I came back I went to Theodore Roosevelt High School and finished at night.

Q Were you born in New York City?

A Yes.

Q And reared in New York City?

A That's correct.

Q And you say you are forty-eight now?

A Yes, your Honor.

Q Now, have you read the indictment in this case against you?

A Yes, your Honor.

Q Now, tell me in your own words what you are charged with in Count 1 of this indictment. I will let you look at it so you can read it.

A That I conspired with other people to distribute heroin.

Q Now, look at the next count, Count 2. Tell me in your own words what you understand you have been charged with in Count 2.

A That I did help to sell some drugs on March the 19th, 1974.

Q And what does it charge you with? Read it. (The defendant read Count 2 of the indictment.)

Q And what are you charged with there?

A The sale of half a kilo.

Q Do you understand that you are charged with possessing a half a kilo of heroin with intent to distribute it?

A Yes, your Honor.

Q And what are you charged with in Count 3?

A The same thing, your Honor, on a different date, on the 25th of March.

Q And in Count 1, you are charged with what?

A With conspiracy to distribute drugs.

Q Conspiring with others to possess heroin with intent to distribute. Do you understand the charge in that count?

A Yes, your Honor. (at pp. 2–4.)

\* \* \* \* \* \*

Q Do you understand that by pleading guilty to the first count in the indictment, the conspiracy count, the Court might sentence you to a term of imprisonment of up to fifteen years?

A I do, your Honor.

Q And, in addition, may impose a fine of up to $25,000?

A I do, your Honor.

Q Do you understand that by pleading guilty to the second count in this indictment, the Court might impose a term of imprisonment of another fifteen years?

A I do, your Honor.

Q And, in addition, may impose another fine of up to $25,000?

A Yes, your Honor.

Q You understand that by pleading guilty to Count 3 of this indictment, the Court might impose a third term of up to fifteen years?

A I do, your Honor.

Q And, in addition, may impose a third fine of up to $25,000?

A I do, your Honor.

Q Making a total of forty-five years in prison?

A Yes, your Honor.

Q And fines totaling up to $75,000? Do you understand that?

A Yes, your Honor. (at pp. 5–6)

\* \* \* \* \* \*

Q Now, you know that the Government desired to have your indictment here dismissed so that you could stand trial in the State Court?

A I am fully aware of that, your Honor.

Q You were here while we discussed that matter, weren't you?

A Yes, I was, your Honor.

Q You understand that it is the Government's view that if you stood trial in the State Court and you were convicted on these same charges which are pending against you there, that you would receive a greater sentence because of the mandatory nature of the State penalty there, than you would receive in this Court?

A I heard that, your Honor.

Q Did you hear the Government say that?

A I heard him, yes.

Q Now, are you pleading guilty here simply because you think you would be treated more severely in State Court than you would be here?

A I am pleading guilty because I am guilty, your Honor.

Q Well, did you hear me say to the United States Attorney that in my view the penalty, the maximum possible penalty which you faced here was equal to that which you face in the State Court? Did you hear me tell him that?

A I did, your Honor.

Q And you understand that you face a maximum possible penalty here of forty-five years?

A Yes, your Honor.

Q And in the State Court, the U. S. Attorney has said, the Judge, if you were convicted there, would be required to sentence you to a term of imprisonment of at least fifteen years?

A Yes, your Honor.

Q And that the sentence could be fifteen years to life?

A Yes, your Honor.

Q And did he say the sentences would be concurrent?

MR. AMOROSA: I think if he were convicted on more than one count, the sentences would have to run concurrently.

THE COURT: Under State law?

MR. AMOROSA: Yes.

THE COURT: So that if you were convicted in the State Court, you would on all these charges be sentenced mandatorily to a term of fifteen years to life. Do you understand that?

THE DEFENDANT: Yes, your Honor.

MR. AMOROSA: Judge, I believe that's fifteen to twenty-five to life.

THE COURT: Fifteen to twenty-five to life.

BY THE COURT:

Q Do you understand that?

A Yes, your Honor.

Q Well, if you got forty-five years here, that would be greater than the State Court penalty or equal to it, wouldn't it?

A Yes, your Honor, it would.

Q And, understanding that, you still want to plead guilty here?

A Yes, your Honor." (at pp. 18–20.)

Defendant was then asked to tell the court in his own words what he did which would show that he was, in fact, guilty of each of the charges to which he was offering to plead guilty.

The following colloquy ensued:

"Q (Continuing) Now, tell me in your own words what you did which shows that you are in fact guilty of conspiring with Charles Daniels and two women, I gather, in here, and others, to distribute and possess with intent to distribute Schedule I and Schedule II narcotic drug controlled substances.

A Well, one James Culhane came to me and asked me if I could help him get some drugs. I did so. I brought him in contact with Charles Daniels, who in fact got some drugs from another person, named Alex Pulpus. I took the money so that Alex Pulpus would be assured of getting paid.

Q How much was the money?

A What it says here. As best I can remember, it was the same money as listed here.

Q How much was the money?

A Ten thousand on one occasion, forty-five hundred on another and twelve thousand, five hundred on another.

Q And you said Charles Daniels was involved?

A Yes, your Honor.

Q And were there other people involved?

A Alex Pulpus, your Honor.

Q And what was the name of the man you said approached you?

A James Culhane.

Q And what did he want from you?

A He wanted to buy some drugs.

Q What kind of drugs?

A Anything that I could produce, but the people were able to produce heroin for him.

Q Did he want heroin when he approached you?

A Yes, your Honor.

Q And you agreed to help him get it?

A Yes; I did.

Q And you talked to Charles Daniels about it, you say?

A I talked to Charles Daniels and Alex Pulpus.

Q And then you went somewhere with him, you say?

A Well, I took him on one occasion to Charles Daniels, the first occasion. Before that, I told Alex that this was a good way; I knew he had gotten some drugs from an Anthony Verzino, and I told him this was a good way to get money to pay Anthony Verzino the money he owed him.

Q All right. Now, Count 2.

(The Court read Count 2 of the indictment.)

Q (Continuing) Were you also known as 'Railroad'?

A Not until they told me I was, your Honor.

Q Were you also known as 'Rail'?

A Not until they told me.

Q Also known as 'R.R.'?

A Those are my initials.

Q Charles Daniels, Jane Doe I and Jane Doe II—

(The Court continued reading Count 2 of the indictment.)

Q (Continuing) That was on March 19th. Tell me what you did on March 19, 1974, here in the Southern District of New York, which shows that you are in fact guilty of the charge made against you in Count 2.

A Well, I received ten thousand dollars from James Culhane. I forwarded this money. I saw that Alex Pulpus got it, and I told Charlie to go to Alex and see if he can make the arrangements to deliver the drugs to James Culhane.

Q And what happened?

A He did, apparently.

Q Wait a minute, now. You took ten thousand dollars from whom, again?

A From James Culhane.

Q Was he the man you mentioned before?

A Yes, your Honor.

Q —that approached you?

A Yes, your Honor.

Q And you then did what?

A I took him to Charlie, but prior to taking him to Charlie I had made arrangements for Charlie to go to Alex to make sure that drugs were available.

Q And who was Charlie?

A Charlie Daniels.

Q And who was Alex?

A Alex Pulpus was the fellow who had the drugs. He had received them from Anthony Verzino.

Q Alex had received the drugs from whom?

A Anthony Verzino.

Q Well, who had the drugs.

A Pardon me?

Q Who possessed the drugs? It says here that you distributed the drugs. You say you did not?

A I never had the drugs in my possession, no, your Honor. I facilitated the transportation. I told Alex that I would more or less vouch for this James Culhane and vouched that the money was good.

Q You told Alex what?

A I told him that I had the money to give for the drugs, to give the drugs to Charlie to give them to James Culhane.

Q Well, did that happen?

A Yes; it did, your Honor.

Q Alex gave the drugs to Charlie?

A Right, your Honor.

Q And Charlie gave them to whom?

A To Mr. Culhane. James Culhane.

Q And when did that happen?

A On March the 19th, I believe.

Q And where did it happen?

A I believe in the vicinity—I wasn't present, your Honor. It was 113th Street and Eighth Avenue.

Q Well, how did you know that it happened?

A Mr. Culhane came and told me he got them.

Q And what did you do with the ten thousand dollars?

A I gave it to Alex.

Q When did you give it to Alex?

A On the 19th.

Q And where?

A 114th Street and Eighth Avenue."

(at pp. 22–26.)

Defendant said substantially the same thing with respect to Count 3.[16] However, at the urging of his attorney (who was apparently fearful that because of the Government's protestations against defendant's version of the facts the plea might not be accepted) defendant finally admitted his involvement with Anthony Verzino and Mario Perna, defendants convicted before Judge Cooper of this court in a case involving large quantities of heroin.[17] The admission was carefully guarded but sufficient for purposes of Rule 11.

"Q All right. Are there any questions you would like to ask the Court or your attorney before I finally accept your plea of guilty to Counts 1, 2 and 3?

A May I see my attorney?

(Pause.)

A (Continuing) Well, I knew of other people who were in the ring with Pulpus. I knew about Anthony Verzino and Mario Perna, and these are the people—my lawyer advised me to tell you about them. They actually supplied the drugs to Alex Pulpus through my introduction. I introduced Anthony Verzino to Alex Pulpus.

Q So you knew that Anthony Verzino possessed these drugs?

A Yes; I did, your Honor. I had an obligation to Anthony Verzino, and he got his money. That's why I—

Q Pardon me?

A I had an obligation to Anthony Verzino. He was then in jail at the time. I had an obligation to see that Alex Pulpus paid him for the drugs that he owed him.

Q Well, let me ask you this: you don't deny that you were involved in the drug traffic, do you?

A No, your Honor. I do not.

Q By this arrangement?

A No, your Honor; I do not.

16. Id. at pp. 28–31.

17. Id. at pp. 35–56.

Q How much heroin was involved in each of these transactions?

Q A half a kilo, your Honor.

Q Each time?

A Yes, your Honor."

(at pp. 35–36.)

It was the Government's theory of the case that defendant was the source of supply and not Alex Pulpus, as defendant had claimed, and that defendant had received these drugs from Anthony Verzino.[18] At the very least, defendant's admissions regarding Verzino established that he aided and abetted large scale trafficking in heroin and conspired with others to sell heroin as alleged.

In Item G (Investigation Reports, Drug Enforcement Administration, United States Department of Justice) submitted by defendant, himself, to show his cooperation with the Government, and as a part of his Appendix in support of his Brief on his motion to plead to all counts, the following information is contained: "Since April 1, 1974 [defendant] has penetrated the Alfred CATINO organization . : . and has identified CATINO as the incarcerated Anthony VERZINO'S replacement in the narcotics traffic. Additionally, the informant has indicated Catino to have been his (the informant's) source of supply and admitted that on one occasion, he purchased five kilograms of heroin from CATINO, et al." (at p. 3).

In addition, on the third page (3), second paragraph, of a second report contained in Item G, defendant is shown to have admitted purchasing 5 kilograms of heroin from Catino for a quarter of a million dollars. He is also shown by the same paragraph to have admitted to both state and federal agents that he had obtained heroin from Anthony Verzino.

After the plea of guilty was accepted to each count, the Government moved to have defendant remanded. In that regard, the transcript reads as follows:

"THE COURT: Change that to Friday, January the 9th, at eleven o'clock. A presentence report will be required.

All right. Now, you were making an application for the defendant to be remanded.

MR. AMOROSA: Yes, your Honor.

This defendant is a former police officer in the City of New York. He is currently a bondsman in the City of New York and has been a bondsman for the last several years.

The evidence in our possession, Judge, is quite different from what the defendant represented to you during the Rule 11 proceeding. In connection with Count 1, if we went to trial in this case, we would be prepared to prove that on numerous occasions during the period of the conspiracy and just prior to it the defendant received massive amounts of heroin from Anthony Verzino, which he in turn sold.

In fact, the defendant admitted to representatives of the Government at or about the time of his arrest, on April 1, 1974, that just prior to the time of his arrest he had paid out approximately $250,000 for five kilograms of heroin. He paid the money to a person by the name of Battino or Battino's organization, either the person or his organization.

He is right now on $150,000 cash security bail in the State Court. Of course, because of this proceeding, I am sure Judge Denzer in a matter of weeks, assuming the Government does not take an appeal from your Honor's decision, will dismiss that case in all likelihood.

Therefore, there has to be bail here, even if your Honor believes that the defendant should not be remanded. We submit that based upon what the defendant has already admitted to you here, in addition to what the Government has represented as to the defendant's background and the quality of person before the Court at this time, that he at this time presents a danger to the community in which he resides and should be remanded for that reason.

18. Id. at p. 31.

He should also be remanded because he has access to tremendous amounts of money. He is in a different context than he was a few hours ago. Now he faces forty-five years in prison. He recognizes by the seriousness of this proceeding that the faces a substantial period of incarceration.

Because of that, we also feel that no conditions your Honor could set could adequately assure his presence here on the day of judgment in this case.

THE COURT: Does the defendant care to be heard?

MR. COHEN: Yes, your Honor.

I think your Honor should know a great deal more, in light of the application than what you have been told. The defendant is married, lives with his wife and children, and has for many years, in Great Neck, Long Island. He is a property owner there, has a very substantial home.

As you have been told, he is and has been a businessman engaged in the bond business for many years.

THE COURT: When was he a police officer?

MR. COHEN: He was a police officer in the City of New York from 1951 to 1959. He was separated by reason of a service-connected injury, disability.

This man was indicted, your Honor, and arrested April 1, 1974, eighteen months ago or more. During all of this time, he knew better than anybody else the strength of the case against him. If he were minded to flee the jurisdiction or not to face the consequences of his acts, he has had eighteen or nineteen months to do so.

He was originally held in $75,000 bail when he was arranged, [sic] which he posted. That money—the bond was collateralized by his father and brother.

THE COURT: Was that in this case?

MR. COHEN: No. That was in the State case. It was in the State case, your Honor. He was not arraigned, by reason of a waiver in the Federal case, until some time in May, I believe it was, of 1975.

While he was on that $75,000 bail he has reported to the State Court I think with religious uniformity, about every two weeks, as required by their rules. He has never been five minutes late for an appearance, whether it be one scheduled two or three weeks in advance or one hastily called by the Court on two or three hours' notice.

When he was arraigned in the Federal Court, it was Agent Caffrey who recommended to the United States of America that an ROR of Ten thousand dollars would be appropriate, and that is the bail he is presently in.

When the superseding indictment was returned against him, on October 3rd of this year in the State Court, there was an application to remand, again because we were approaching near to the day of trial, and the claims were that his evident guilt was now being uncovered by the Huntley hearings, and Judge Fitzer then increased the bail to $150,000.

Relatives again came to his help. They posted the required collateral, and the surety company bond is there now in the sum of $150,000.

Now your Honor is told that there is certainty of his guilt. Of course. The man has admitted his guilt. He has literally fought his way into this courtroom, as your Honor knows, through the efforts of two lawyers, in order to come in and tell you he is guilty, knowing all the time what the penalties will be. He didn't learn that for the first time here today.

Your Honor may rest assured that this defendant—and I had heart-to-heart talks for three months about what the resultant possibilities are if he pleads to the three counts of this indictment. It is nothing novel. He has known about it for months. If he did not intend to appear on sentence date and be amenable to your Honor's order, he could have been long gone.

Under those circumstances, your Honor, it seems to me nothing but a continuation of a vendetta of both the State and the Federal Government to ask your Honor to remand a man under those circumstances.

They trusted him all along. They know, your Honor, that ever since last July—they have told him they don't want his cooperation any more. That is a matter of record. He has known that. It is not new. If he were going to go, he would have been long gone, in the parlance.

Under those circumstances, I suggest to your Honor that no bail purpose, no legitimate purpose would be served by remanding him or increasing his bail.

MR. AMOROSA: Perhaps the children of some of the people in the city would disagree, your Honor.

THE COURT: Well, just a minute.

The Court directs that the defendant be remanded. He is convicted now by his plea of guilty to each of these counts. As I advised him, he faces a possible maximum penalty of forty-five years in prison and fines up to $75,000. I think that the severity of those possible penalties makes it quite likely that the defendant would attempt to flee the jurisdiction and not be present at the time of sentence.

Moreover, since he has pleaded guilty now and has not yet been sentenced, he doesn't have any right to bail pending sentence, so he is remanded.

THE DEFENDANT: May I be heard, your Honor?

THE COURT: Yes.

THE DEFENDANT: As far as my fleeing the jurisdiction is concerned, that is completely out of the question, your Honor. I would have no place to go. My whole family is in this area. My children—that's my whole life, your Honor. I am not going any place.

MR. COHEN: Could I make a suggestion to your Honor? I realize that the bail posted on the Federal charge is not very large. Would your Honor care to set a bail that would avoid the remanding?

THE COURT: Well, as I have just said, he is not entitled to bail pending sentence.

MR. COHEN: I am not asking for it as a matter of right, your Honor.

THE COURT: So the application is denied for the reasons I have said. The quantity of drugs involved is substantial. The U. S. Attorney has brought to my attention information regarding the defendant's background which indicates that he is a large trafficker in drugs.

THE DEFENDANT: Would your Honor give me until Monday?

THE COURT: As I have said, he has no right to bail at this time, because he has not yet been sentenced. He has pleaded guilty.

MR. COHEN: Your Honor must realize that ever since his arrest, in 1974, he has been in close touch with the police. He has not been engaged in any traffic or any thing illegitimate at all, and therefore his continuance under present circumstances could not likely lead to any violations of the law.

Above all the man does have a business and a family, and I would hope, your Honor—

THE DEFENDANT: There are so many things I would have to take care of.

MR. COHEN: I would hope that your Honor could give him some time before remanding him.

THE DEFENDANT: There are so many things—

THE COURT: Your lawyer can take care of those things.

The defendant is remanded.

THE DEFENDANT: Will your Honor give me until Monday, give me until Friday? I will surrender myself. Your Honor, would you please give me until Friday?

THE COURT: No. The marshals are here now.

THE DEFENDANT: I will surrender myself Friday morning at eleven o'clock.

THE COURT: The marshals are here, and the defendant is remanded.

THE DEFENDANT: Your Honor, may I give my lawyer some money that I have in my possession?

THE COURT: Yes."

**1232**

(Adjourned for sentencing to January 9, 1976 at 11:00 o'clock a.m.)

(at pp. 38–45.)

As is crystal clear from the foregoing transcription of what transpired at the time of plea, defendant never denied that he was a major trafficker in drugs as claimed by the Government and as shown by his own admissions to the Government during his many debriefings. He admitted his involvement with Verzino since he knew that the Government had come by this information as a result of his own admissions to Government agents.

Defendant subsequently on December 9, 1975 filed a written application for bail pending sentence. Again defendant did not deny that he had been involved in the drug traffic in a major way. There his claim was that since his arrest on April 1, 1974 when he had begun acting as an informant and an undercover agent for the Government he had not been so engaged. He also said that pending sentence he, of course, would not be involved in selling drugs. In response to this application, the Government on December 9, 1975 filed in chambers an affidavit in opposition. In that affidavit the Government states (p. 4, para. 7 and 8):

"(7) On December 3, 1975, the Honorable Irving Ben Cooper passed judgment on members of the Perna-Malizia-Verzino narcotics organization, who were found guilty by a jury on October 24, 1975, of a massive conspiracy to distribute heroin. It is this same conspiracy of which defendant is a major participant, as the proof at trial before Judge Cooper established. Judge Cooper imposed two thirty-year sentences, one twenty-five year sentence, one twenty-year sentence, one fifteen year sentence, and one eight-year sentence. All convicted defendants were immediately remanded.

"(8) I have appended to this affidavit a letter from the Special Narcotics Prosecu-

tor of the City of New York which documents defendant's massive involvement in narcotics trafficking in the New York metropolitan area."

Attached to that affidavit was a letter addressed to this judge dated December 9, 1975 from David F. Cunningham, Chief Trial Assistant District Attorney, Office of Prosecution, Special Narcotics Courts, New York County describing, in great detail, the results of more than two years of investigation of defendant. It was submitted as a presentence memorandum.[19] At the bottom of page 6 of the letter is found this statement: "A full discussion of Robin's arrest, his statements and cooperation is laid out in the People's reply memorandum enclosed as Exhibit A."

This brief was attached apparently because defendant had submitted to the court as a part of the Appendix to his Brief In Support Of His Motion To Plead Guilty To All Counts of the instant indictment his brief in the state court which he had filed there in support of his motion to dismiss the superceding state indictment. Defendant had moved to dismiss that indictment on the ground, inter alia, that he had been promised that in exchange for his cooperation, he would be permitted to plead to the federal indictment and the state charges would be dismissed.

By Memorandum Opinion dated December 11, 1976, but not filed until December 16, 1976, the motion of defendant for bail pending sentence was denied.

At time of sentence defendant offered a transcript of a tape which he says exonerates him from the Government's claim that he was a major narcotics dealer. The Government objected to the offer on the ground it had not had a chance to see the offer. The court refused to read the offer at that juncture since the Government had not seen it.[20] Defendant's claim was that at the time of his arrest the arresting offi-

19. The letter is attached to this opinion as Appendix A.

20. That transcript is set forth in Appendix B to this opinion with letter from Mr. Jack Cohen acknowledging that this is the document referred to by him at the time of sentence, a small part of which was incorporated in the record on appeal by defendant in this case.

cers believed him to be only a small dealer and the transcript of the tape he was offering would prove it. The Government's reply was—what does that have to do with what we have learned since the arrest. Defendant then offered another document, marked Defendant's Exh. 1. A recess was taken to give the Government an opportunity to review the document.[21] This was another investigative report (i. e. excerpt of report) detailing defendant's cooperation with the Government and again admitting purchase of 5 kilograms of heroin from Catino. The Government offered other portions of these reports as its Exhibit 1.[22] A luncheon recess was also taken.[23] Defendant never again offered the transcript although there was ample time allowed for review of the document by the Government before the sentence hearing ended after lunch.

Before sentencing the defendant to 30 years and $75,000 in fines,[24] the Court addressed the defendant as follows:

"Now, the question is, do you wish to make a statement in your own behalf at this time, or to say anything as to why these maximum penalties provided by the law should not be imposed in your case?

THE DEFENDANT: Yes, your Honor, I do. Number one, what I have admitted to I am standing here before you to be sentenced on. What Mr. Johnson, Mr. Cunningham and Mr. Amorosa have stated are lies.

I have had anything to do with Anthony Verzino in the sale of drugs before, or to the state. [sic] I can look you in the face, or anybody else in the courtroom in the face, and say it. That has never taken place. They are trying to make me what I am not. They are going into court and committing perjury so Mr. Cunningham can be promoted. He does not say that he waited a year before he arrested me, and he waited for Mr. Sterling Johnson to move ahead and he received a job. He wants to further promote his own interest. That is where I am at right now. I am here, and facing the maximum penalties because Mr. Cunningham feels I let him down. They are both unbeknowing of what took place behind the lines.

I also feel, your Honor, as far as—

THE COURT: You say you never purchased any drugs from Anthony Verzino?

THE DEFENDANT: No, your Honor. I never did. Nor, for that matter, anybody else, other than the instance I described in taking my plea.

May I continue, your Honor?

THE COURT: Yes.

THE DEFENDANT: As far as the sentences, I have been exposed to a jail and I know what it is like. Any long period will not put any more ideas in my head, as they would say, as a deterrent. I have had it. Whether you get one year, ten years or twenty years, I'm not going to get anywhere near this type of involvement ever again for any reason.

THE COURT: Well, at the time of your plea I think you advised me, and the record reflects that you knew about Anthony Verzino and Mario Perna, isn't that so?

THE DEFENDANT: Yes, your Honor, I did.

THE COURT: And you said, 'They actually supplied the drugs to Alex Pulpas through my introduction.'

21. Tr. of Sentence Hearing, 1/9/76 pp. 17–19.

22. Id. pp. 19–22.

23. Id. pp. 37–38. During the luncheon recess the court read the transcript of the hearing on defendant's motion to dismiss the state court indictment (Huntley Hearing) and so advised the parties. Id. at p. 38.

24. Defendant was sentenced to 15 years on Counts 1 and 2. These sentences were to be served concurrently. Defendant was sentenced to 15 years on Count 3 to follow the sentence on Counts 1 and 2. Defendant was sentenced to the minimum mandatory parole period of 3 years to follow the term of imprisonment. He was fined the maximum amount of $25,000 on each count. 21 U.S.C. §§ 846, 812, 841(a)(1) and 841(b)(1)(A).

Defendant would have been eligible for parole after serving ten years of his 30 year sentence. 18 U.S.C. § 4205(a).

THE DEFENDANT: Basically, Anthony Verzino asked me what type of person he was, and I explained that Alex had invested a substantial amount of money in a movie at my urging, and basically what I was doing was encouraging Anthony Verzino to know that Alex Pulpas was a person of means.

That is what I meant by 'introduction.'

THE COURT: You said that 'Anthony Verzino and Mario Perna, they actually supplied the drugs to Alex Pulpas through my introduction.'

THE DEFENDANT: I never had anything to do with Mario Perna in that respect.

The only one in contact with me was Anthony Verzino, and he asked me about Alex Pulpas. That was my involvement in that situation.

Any drug dealings that Mr. Verzino describes—

THE COURT: Well, going on, I said, 'So you knew that Anthony Verzino possessed these drugs?' 'Yes, I did, your Honor. I had an obligation to Anthony Verzino, and he got his money.'

Do you remember that?

THE DEFENDANT: I recall something similar to that. What I meant there was that my obligation was to see that he got his money from Alex Pulpas because he asked me as a friend to do, and I felt I had an obligation when, in fact, I probably did not have that type of obligation.

THE COURT: Is there anything else you want to say?

THE DEFENDANT: No, your Honor, I don't.

THE COURT: Well, it seems to me, Mr. Robin, that after spending a great deal of time on this matter and reviewing what occurred at the state court hearing and the letter from Mr. Cunningham and your exhibit, Defendant's Exhibit 1, which you handed up this morning, it seems clear to me that you were involved with the drug traffic in a major way.

It seems to me that the only way you get to know somebody like Anthony Verzino or Mario Perna or people like that who you indicated supplied drugs to Alex Pulpas is to be involved with such people.

THE DEFENDANT: May I say something on that, your Honor?

THE COURT: Yes.

THE DEFENDANT: I was in the bail bond business, your Honor, at this time.

My only business with these people was basically in bail. If I was a bible salesman, I would have knowledge of quite a number of rabbis, priests, and other representatives of the church. Those would be the people that I would deal with. Being in the bail bond business I deal with these types of people. Those are the only types of people that need my services.

THE COURT: As I have indicated, it seems to me that the record is now clear that your involvement in the narcotics business was on a major scale.

THE DEFENDANT: May I say something in regard to the finances, your Honor?

If the records were checked, your Honor, I have recently—and I imagine four or five years ago, I borrowed money, and it has taken me three years to pay off a $20,000 loan, your Honor.

If I were the type of person involved in drugs, it would take two days to pay off a $20,000 loan. I paid it in dribs and drabs. $500 or $1000 was the maximum payment that I paid this particular loan off.

THE COURT: Let me ask you this then. You say that your finances indicate that you do not have very much money.

THE DEFENDANT: No your Honor. I have never been a wealthy man in the classification that Mr. Cunningham or Mr. Amorosa places me.

I purchased a home that grew in value and it ate up whatever finances I have been able to earn, but I don't have any great sources of income or no great wealth at this time.

THE COURT: Did you tell the probation officer in 1966 you purchased an acres of land and built a new house?

THE DEFENDANT: Yes, I did, your Honor.

THE COURT: With completion cost of approximately $85,000 or $90,000?

THE DEFENDANT: Yes, your Honor. It was a $35,000 mortgage on that house at that time.

THE COURT: What did it cost you to build?

THE DEFENDANT: The house itself cost approximately $40,000 or $45,000.

THE COURT: You mean the information and presentence report is incorrect? It says 85 to 90.

THE DEFENDANT: That includes the value of the land, your Honor.

THE COURT: The real estate taxes on that house are $6,000, is that it?

THE DEFENDANT: Yes, your Honor, at that particular time.

THE COURT: Is that house presently up for sale?

THE DEFENDANT: It has been, yes, your Honor.

THE COURT: What is the asking price, $235,000 at one time?

THE DEFENDANT: This is the price the real estate people said I should ask and look for. What I really wanted.

THE COURT: Well, this seems to me, Mr. Robin, that even to maintain a house in the value of about $200,000 would cost a lot of money.

THE DEFENDANT: That is why we have been looking to sell it for a considerable period of time, your Honor.

Plus there is also a lien against the house right now from the insurance company, and there has been for a considerable period of time.

THE COURT: Well, again, I think that your involvement in the narcotics business on a major scale has been substantiated by your own exhibit.

It is the view of the court that you cannot get involved with narcotics even in the amount that you sold, that is, a half a kilo, on each occasion unless you are substantially involved in the narcotics traffic.

You have to be a major dealer in order to even come anywhere close to that amount of narcotics.

THE DEFENDANT: As I explained to you upon pleading, your Honor, I never possessed this narcotics. The narcotics belonged to another person, and all I did was to bring two people together and help facilitate this thing.

It never belonged to me. None of the proceeds—I have never made one ten-cent piece from the sale of drugs, your Honor, as I stand here now.

THE COURT: It also seems clear to me, Mr. Robin, that anybody who would risk getting involved in the narcotics traffic, in view of the very severe penalties now provided under both state and federal law, they would have to be involved in such an enterprise because it had substantial amounts of money in it for them, isn't that so, and this took place after the so-called Rockefeller law went into effect in New York State.

THE DEFENDANT: You are absolutely correct, your Honor, and I was a fool.

THE COURT: You are a former policeman, aren't you?

THE DEFENDANT: Correct.

THE COURT: And you are a bail bondsman, and you have been for fifteen years.

THE DEFENDANT: Correct, your Honor.

THE COURT: And you knew all about the severe penalties provided by state law, is that not so?

THE DEFENDANT: Absolutely correct, your Honor, and foolishly I felt at the time that what I was doing was not true involvement, and I was stupid and wrong in what I did.

THE COURT: So in view of your background as a former police officer in the City of New York, and a bail bondsman for fifteen years, I find it difficult to believe your assertion that you were simply aiding somebody by bringing two people together, and were not really involved in narcotics on a substantial scale.

THE DEFENDANT: I can only tell you the truth, your Honor, as I know it.

THE COURT: Have you finished everything?

THE DEFENDANT: I guess I have been finished for a long time, your Honor."

(at pp. 50–59.)

Defendant took an appeal from his sentence. The sentence was vacated, 545 F.2d 775 one judge dissenting, and the case referred to another judge for resentencing.[25] The Government has presently pending before the Court of Appeals a petition for rehearing. In connection therewith, the court orders the following documents sent up to the Court of Appeals pursuant to the provisions of Rule 10(e) of the Federal Rules of Appellate Procedure:

(1) Defendant's Memorandum In Support Of Motion For Leave To Enter Plea Of Guilty To All Counts filed November 21, 1975 in chambers;

(2) Defendant's Appendices to the foregoing brief, which consisted of the following:

(a) *State vs. Ray*, indictment no. N529–129–74.

(b) *United States of America vs. Raymond Robin*, indictment no. 74 Cr. 622.

(c) *State vs. Robin*, indictment no. N1161–594/75.

(d) Federal waiver of speedy arraignment, dated April 1, 1974.

(e) State waiver of speedy arraignment, undated.

(f) United States Attorney's notice of readiness for trial.

(g) Investigation reports, Drug Enforcement Administration, United States Department of Justice.

(h) Transcript of testimony on "Huntley Hearing", October 27, 1975, *State vs. Ray Robin*, before Honorable Richard G. Denzer, J.S.C.

(i) *State vs. Ray Robin*, Defendant's Memorandum of Law in Support of Motion to Dismiss State Indictment.

(j) *United States of America vs. Raymond Robin*, transcript of proceedings, November 12, 1975 before the Honorable Constance Baker Motley.

(3) Letter from counsel for Defendant, Jack L. Cohen, to the Court transmitting brief and appendices dated November 21, 1975;

(4) Transcripts of hearing of November 25, 1975 at 5:00 P.M. and 6:30 P.M.

(5) People's Memorandum of Law submitted in reply to defendant's motion to dismiss the indictment against him in the New York Supreme Court annexed as Exhibit A to the letter to this court, dated December 9, 1975, from David F. Cunningham, Chief Trial Assistant District Attorney, which was appended to the affidavit, dated December 9, 1975, submitted by Assistant United States Attorney Dominic F. Amorosa in opposition to defendant's application for bail pending sentence.

(6) Transcript made at the time of the defendant's arrest on April 1, 1974 and referred to by defense counsel on pp. 8 et seq. of the transcript of the sentencing hearing on January 9, 1976. A portion of the transcript is reproduced at p. 20(a) of defendant's appendix on appeal.[26]

(7) Government's Exhibit 1 introduced at the hearing on January 9, 1976, i. e., report of Ronald J. Caffrey dated October 15, 1975.

(8) Additional transcript of proceedings on November 25, 1976, transcribed at this court's request on 11/30/76.

---

**25.** Decided October 15, 1976.

**26.** Tr. of Sentence Hearing 1/9/76, pp. 30–32, 36, 39–41.

(9) This opinion.

(10) Transcript of Huntley Hearing in State Court.

At the time of the sentence the court considered in connection with the conspiracy count, Count 1, the evidence relating to the purchase by defendant of five kilograms of heroin from Catino to which defendant, himself, had admitted as set forth above. The court also considered defendant's admission on his plea of guilty to all three counts that he had aided and abetted the multi-kilogram operations of Verzino and Perna.[26] Catino was, according to defendant, Verzino's agent after Verzino was imprisoned.

The court refused to consider, on due process grounds, such matters contained in Mr. Cunningham's letter of December 9, 1975 and the presentence report as whether defendant was guilty of certain alleged misconduct as a union official and whether he was, in fact, the banker for the alleged numbers kingpin operator Raymond Marquez.[27]

Because of the importance of this case, the court has also attached to this opinion the entire transcript of the sentence hearing (Appendix C) and of the hearing on the Government's motion to dismiss the instant indictment on November 25, 1975 (Appendix D) and of the plea (Appendix E).

## APPENDIX A

### OFFICE OF PROSECUTION

### SPECIAL NARCOTICS COURTS

26 FEDERAL PLAZA NEW YORK, N.Y. 10007

STERLING JOHNSON, Jr.
Special Assistant District Attorney

ROOM 437
(212) FR 4-1300

December 9, 1975

Honorable Constance Baker Motley
District Court Judge
Southern District of New York
Foley Square
New York, New York 10007

Dear Judge Motley:

I am an Assistant District Attorney in New York County and am currently assigned as the Narcotic Bureau Chief in New York County; and as the Chief Trial Assistant to Sterling Johnson, the New York City Special Narcotics Prosecutor. I have been in charge of the investigation and trial of Raymond Robin since its inception on November 29, 1973.

This letter is submitted as a presentence memorandum in order to more fully apprise you of the facts and circumstances relevant to the sentencing of this particular defendant.

I. FACTS:

A. The Malizia, Verzino, Perna Conspiracy.

Ray Robin was a multi-kilogram heroin customer of Anthony Verzino, Ernest Malizia and Mario Perna. The latter two began purchasing and distributing kilogram quantities of heroin in February, 1973. By August, 1973, the business was worth one million, two hundred thousand dollars ($1,200,000) in accounts receivable, cash, and heroin on hand. Perna and Malizia bought in excess of five hundred thousand dollars ($500,000) of thirty percent (30%) pure heroin from the Joseph Magnano, Frank Pallatta and Richard Bolella organization. Initially, the heroin cost in excess of $25,000 per kilogram, but as Malizia and Perna's buying power grew, the price was reduced to $22,000 per kilogram. Six regular customers were

27. Id. at pp. 2–4, 7–8, 29–31, 35.

developed who would buy multi-kilogram quantities of heroin. One customer, Frank Lucas,was consigned heroin in five kilogram lots at $28,000 a kilogram and by August, 1973 had paid Malizia and Perna in excess of $800,000.

Hon. Constance Baker Motley
District Court Judge - 2 - December 9, 1975

 Anthony Verzino was added to the partnership in late August because of representations that he could make more money for the partnership by supplying a better quality of heroin and recruiting more steady kilogram customers. In the Fall of 1973, the partnership prospered. Old customers were regularly serviced and the Magnano organization continued to supply as much heroin as was needed. Additionally, Verzino fulfilled his promises by obtaining five kilograms of pure heroin for $250,000 from Anthony Delutra and bringing five new customers. Among the new customers were Raymond Robin and James Culhane.

 B. Robin and Culhane

 Verzino had known Robin since 1962 as an ex-New York City Police Officer who had worked for the Raymond and Chili Marquez gambling operation while on the force and after retiring. Verzino knew that in addition to his working in their gambling operation the Marquez's had set Robin up as a bailbondsman in 1960. Additionally, Verzino knew that Robin, like many other wealthy policy operators, had invested profits in the mid-1960's in the narcotics boom. Verzino's knowledge was founded upon his personal supply of multiple kilograms of heroin to many of these gamblers.

 Thus, on August 27, 1973 when Verzino was in 100 Centre Street on another matter and met the ever-present Robin, Verzino spoke with Robin about narcotics. Robin asked if Verzino could get heroin and Verzino replied that he expected to in the future and would keep in touch. Throughout the Fall Verzino and Robin continued to barter. Robin offered $26,500 per kilogram while Verzino held steady at $29,000. To Verzino, Malizia and Perna there was no point in selling to Robin at $26,500 per kilogram when Lucas and the rest of the customers were paying $28,000 and more per kilogram regularly.

 However, after Verzino, Malizia and Perna had spent $250,000 on the five kilogram Delutro deal they were short of cash. It was felt that the few thousand dollars loss in profits on each kilogram given to Robin could easily be made up after diluting and selling their new supply of pure heroin.

 On November 27, 1973, Verzino met Robin at the latter's bail bond office at 81 Baxter Street. Arrangements were made whereby Robin would have a 1973 brown Cougar left in front of Ponti's Restaurant, 231st Street and Broadway, with keys in the ignition at 5:00 p.m. Verzino would take the car and put two kilograms of heroin in it. Robin would then pay the $53,000 owed in the next few days. Verzino then left Robin's office and went to Forlini's for coffee. A few minutes later Robin appeared with James Culhane. Verzino had known Culhane for many years and jokingly treated him like his Irish godson. Verzino also knew Culhane as an addict who made his living by robbery and/or selling drugs. Robin urged Verzino to give Culhane some heroin to sell so that Culhane could pay back Robin money

Hon. Constance Baker Motley
District Court Judge - 3 - December 9, 1975

 Culhane owed. Culhane explained to Verzino that Robin had failed to return bail money that he had put up on two cases in 1967 and 1968. Therefore, when Robin came to Culhane to buy several kilograms of heroin for Walter Grant, Culhane had taken Robin's $50,000 and vanished. Culhane felt that since Robin had "ripped" him,he was justified in "ripping" him. Verzino,

without mediating the argument, agreed to give Culhane a half kilogram of heroin.

Verzino then took Culhane to the Old Stone Jug Pub, 3713 Riverdale Avenue, left, and then brought back Perna and a half kilogram of heroin. Culhane was instructed to meet Verzino three days later at Ponti's in order to make his first partial payment. Several hours later Verzino and Malizia observed Alex Pulphus leave a 1973 brown Cougar in front of Ponti's. Verzino took the Cougar to a nearby Waldbaum's parking lot and transferred the two kilograms of heroin from his own car to the Cougar. Verzino returned the Cougar to the restaurant and observed Pulphus re-enter the Cougar and drive out of the area.

On November 29, 1973, Culhane was arrested in possession of his half kilogram of heroin. Dizzy from the after effects of a car accident he attempted to persuade the occupants of a cab to vacate. As the cab driver fled, the police arrived and found Culhane in the front seat attempting to start a keyless cab. Culhane was charged with an A-I felony and agreed to cooperate with the Special Prosecutor's Office and a task force of city and federal officers. Culhane then met Verzino, Perna, Malizia, Frank Caravella, Susan Verzino, Ray Robin and others thirty-one times between November 29,1973 and March 16, 1974 for the purpose of delivering money (18 deliveries = $49,000) and receiving three further consignments of half kilograms of heroin. Culhane used "buy money" supplied by the Special Narcotics Prosecutor's Office and wore recording devices at each meeting. All four of the half kilogram packages were vouchered into the New York City Property Clerks Office. During these conversations Malizia, Perna and Verzino made many references to their other customers, including Robin, and their sources of supply. Culhane phoned Robin the day after he was arrested to have Robin find Verzino and put off the scheduled first payment for the initial half kilogram. The conversation was recorded, as was Verzino's subsequent call back.

During the first week of December, after Robin had finished paying for the first two kilograms of heroin,he ordered three more. The delivery was accomplished in the same manner as the first sale. The price of $26,500 per kilogram remained the same and periodically Perna and Verzino would go to 81 Baxter Street to collect money from Robin. On one occasion, Robinorderedten pounds of manita (heroin dilutent) from Verzino and Perna.

Hon. Constance Baker Motley
District Court Judge - 4 - December 9, 1975

On December 18, 1973, Ernest Malizia was identified as a federal fugitive (Malizia had been using the name of Harry Lupés) and was arrested. After his arrest Verzino and Perna went to Malizia's apartment and recovered cash and the partnership's written accounts. These records were subsequently recovered and list Robin's name on a cash flow sheet and on an account receivable page. A handwriting expert has identified these sheets as being Ernest Malizia's handwriting.

During the first week of January, Verzino consigned two kilograms of heroin to Robin in the same manner as before. Verzino was helped by a onetime customer, Frank Caravella, who he was grooming to take Malizia's place. Robin continued to make partial payments of his debt throughout January. At the end of January Perna and Verzino discussed making Robin a full partner. Lucas was substantially in arrears (in excess of $300,000) and Robin appeared to be a good payer. No agreement was reached as a rift had developed between Perna and Verzino. However, Verzino on his own agreed with Robin that if Robin let him borrow $24,000 he would get Robin purer heroin. Verzino further promised Robin that instead of just giving him 32 ounce kilograms (his normal pattern) he would take the three ounce overage from the real kilogram and accumulate it until it was sufficient quantity for Verzino and Robin to split the profits.

Verzino then met Anthony Soldano through Patsy Malizia (Ernie's brother; still a federal fugitive) and purchased three kilograms of pure heroin for $150,000. Robin's $24,000 was added to monies Verzino, Perna and Caravella accumulated from other customers.

On February 1, 1974, Perna was arrested in New Jersey while selling eight kilograms of heroin to Joey Candella and a D.E.A. undercover agent. Prior to the sale, Perna had, without Verzino's knowledge, made the eight kilograms out of 1 1/2 kilograms of pure heroin. At the time of his arrest Perna had a customers list with Robin's name on it.

After Perna's arrest, Verzino, fearing apprehension, went into hiding for awhile. In the second week of February he transferred two kilograms of heroin to Robin and Pulphus. In mid-February he took Frank Caravella in as a working partner and proceeded to build a new heroin stash in apartment 4J, 1130 Pelham Parkway South. On February 23, 1974, Verzino met Robin at the Pathmark parking lot, 410 West 207th Street. Robin handed Verzino,$20,000 owed on a previous consignment and Verzino transferred to Pulphus's waiting Cougar three kilograms of heroin.

Previous to February 23, Robin stated that he had new Detroit customers who needed "purer goods." Verzino and Caravella mixed a special package of 2 kilograms and this also was transferred to Robin in the Pathmark parking lot. Robin passed the package to two unknown males who in return gave Robin a brown paperbag containing $55,000 as partial payment for the heroin. Robin contacted Verzino the next day to tell him that his Detroit people were pleased with the heroin and would buy more on Monday.

Hon. Constance Baker Motley
District Court Judge - 5 - December 9, 1975

On Monday, February 25, 1974, Verzino and Caravella bought a large piece of plastic to use as a heroin "cutting"board. As they were entering 1130 Pelham Parkway South they were arrested. A subsequent search of apartment 4J (pursuant to a search warrant) revealed in excess of 26 pounds of heroin, 34 pounds of diluting powder, 2 pistols, a scale and 2 pen guns secreted in a hidden compartment in the closet. Among the packages of heroin were six which had the following lables: (1) "5 oz. Railroad", (2) "RR Special", (3) "1/4 Railroad", (4) "1/2 Railroad", (5) "1/2 Rail-road", and (6) "Special 3 to 1 Rail." Additionally, ledgers and address books were found in the apartment and in possession of both Verzino and Caravella which mentioned Robin's name, his phone number, amounts owed and amounts of heroin in various diluted forms on hand. Further, a handwriting analysis of the labels, ledgers and address books indicated that either Verzino or Caravella wrote these items.

The day after his arrest Verzino sent word to Robin that of the monies Robin owed he was to pay Jerry Feltman Esq. $15,000 as a retainer and give $10,000 to Susan Verzino to be disbursed equally among Verzino, Perna and Malizia's wives. Culhane and Susan Verzino visited Anthony Verzino in Sing Sing and Anthony Verzino gave further directions about collecting monies owed. He suggested that Susan tell Alfred Catino a/k/a Herbie that Robin was available as a customer. Several days later Robin told Susan Verzino that he was doing business with Catino.

C. The Robin-Culhane Sales

Robin still claimed that Culhane owed him money from the 1968 Walter Grant incident previously mentioned. Culhane while not conceding the point, on March 19, 1974 suggested that Robin sell him 1/2 kilogram of heroin so they both could make some money. Robin agreed at a price of $14,500 per 1/2 kilogram. Later on March 19, 1974, Culhane paid Robin $10,000 towards 1/2 kilogram at 2076 8th Avenue and was directed by Robin to see Charles Daniels for delivery. That same day Culhane met Daniels and two unknown females and received 1/2 kilogram of heroin.

On March 25, 1974, Culhane paid Robin $4,500 owed on the first package and $12,500 towards a second half kilogram of heroin. Again Robin directed Culhane to meet Daniels for delivery of the heroin. Daniels later that same evening supplied Robin with 1/2 kilogram of heroin.

All of the funds used to purchase heroin from Robin were supplied by the Office of the Special Narcotics Prosecutor. Culhane wore a recording device at each of his meetings with Robin and Daniels.

Hon. Constance Baker Motley
District Court Judge - 6 - December 9, 1975

### D. Robin's Post Arrest Statements

Robin was arrested on April 1, 1974 and after knowingly and intelligently waiving his Miranda rights agreed to cooperate.* During Robin's debriefing he stated that Verzino had referred him to Alfred Catino and that he had just completed a $250,000 five kilogram heroin deal with Catino. Robin further stated that the heroin sold Culhane had been obtained from Verzino. Robin also admitted that he was chided by Catino for bringing Culhane, an informant, to the Verzino organization.

### E. Related Convictions

In United States v. Magnano et al., 75 Cr. 687, Joseph Magnano, Frank Pallatta, Richard Bolella, Anthony Delutro, Anthony Soldano and Frank Lucas were tried and convicted for the above-described conspiracy and substantive counts. Magnano and Pallatta received two 30 year concurrent terms, Delutra received two 25 years concurrent terms, Bolella received 20 years and Soldano fifteen. Lucas's sentence is still open pending the outcome of his trial on another case. Mario Perna and Anthony Verzino have plead guilty to numerous state and federal counts and are awaiting sentence. Ernest Malizia (as the Court must well know) escaped West Street and is still at large. Frank Caravella plead guilty to state conspiracy and substantive sale counts and received concurrent sentences of 6 to life. James Culhahe's case is still open.

### II. Sentencing Recommendation:

Generally, neither the New York County District Attorney's Office nor the Special Narcotics Prosecutor's Office makes a specific sentence recommendation. However, in Robin's case a number of factors demand that such a recommendation be made.

First, Robin during late 1973 and early 1974 was a major figure in New York's heroin traffic. Robin bought 15 kilograms of heroin from the Verzino organization for $397,500 and five kilograms from Catino for $250,000. Robin sold two 1/2 kilogram packages of heroin to Culhane for $27,000.

Second, since the inception of the Rockefeller Narcotics Law 430 defendants, have received life sentences after conviction in Manhattan Narcotics Parts. No more than three of the defendants who received these sentences approach the stature in the narcotics trade of Robin and his confederates. Each of these defendants received 15 or 20 years to life. Surely, Robin deserves no better treatment than these other convicted narcotic sellers.

---

\* A full discussion of Robin's arrest, his statements and cooperation is laid out in the People's reply memorandum enclosed as Exhibit A.

Hon. Constance Baker Motley
District Court Judge - 7 - December 9, 1975

Third, Robin served as a New York City Police Officer for eight years and retired with a disability from a car accident. Verzino's descriptions of Robin's activities while a police officer, Robin's testimony at the state hearings on this case, and Robin's narcotics trafficking indicate beyond any doubt his contempt for his oath of office as a police officer. Further, Robin has served for the last fourteen years as a licensed New York State bailbondsman. Again his conduct in this case is totally in abrogation of that oath of office.

 Fourth, Robin's cooperation was generally of an intelligence nature and severely limited by his refusal to get involved in a case where he would have to testify. An outline of Robin's cooperation is enclosed in Exhibit A. Several times it was clear that Robin had information that could have made prosecutable cases against members of the narcotics underworld and the Criminal Justice System.

 At best, the only thing Robin's cooperation was worth was allowing him to remain free for 20 months from April 1, 1974 until November 25, 1975.

 Governor Rockefeller, in an April 13, 1973 memorandum to the legislature, accompanying the proposed revisions in the drug laws stated:

> The only way to deter this commerce
> in tragedy is by measures so strong,
> so effective, so fully enforced, that
> the hard drug pusher will no longer
> risk his life and freedom by jeopard-
> izing the lives of others...The hard
> drug pusher destroys lives just as
> surely and far more curelly than the
> cold blooded killer. He threatens
> society as a whole...(McKinney's 1973
> Sessions Laws, 196th Session p. 2319).

 The Court has before it a defendant who is directly responsible for this "commerce in tragedy." The New York County District Attorney's Office and the Special Narcotics Prosecutor's Office recommend that the defendant receive the maximum term on each count so that he will serve at least fifteen years.

 Very truly yours,

 *David F. Cunningham*

DFC:ml 
Enc. David F. Cunningham 
 Chief Trial Assistant District Attorney

cc: Mr. Jack Cohen 
 c/o Greenberg and Margolis 
 Bank Building 
 100 Evergreen Place 
 East Orange, New Jersey 07018

## APPENDIX B

# Greenberg and Margolis, P. A. *Counsellors at Law*
A PROFESSIONAL CORPORATION 
BANK BUILDING, 100 EVERGREEN PLACE, EAST ORANGE, N. J. 07018-(201) 674-8800

MARTIN L GREENBERG 
LEONARD E SCHWARTZ 
PHILIP FREEDMAN 
ALLEN B. PEARL 
IRWIN R REIN 
FRANCES S. MARGOLIS 
BERNARD D. PEARL 
STEPHEN N DRATCH 
MARGUERITE M SCHAFFER 
JUDITH R LEVINSON 

JACK L COHEN 
Counsel

## RECEIVED

NOV 2 9 1976

JUDGE MOTLEY'S CHAMBERS November 22, 1976

The Honorable Constance B. Motley
United States Court House
Foley Square
New York, New York

 Re: United States of America vs. Raymond Robin
 74 Criminal 622 76-1033
 on appeal

Dear Judge Motley:

 I write to confirm the subject of a telephone conversation
with Mr. Farmer on November 22, 1976 to the following effect.

 During the sentencing hearing before your Honor I made
reference to the transcript of a tape recording. That tape
recording is one which was made by retired Inspector Leonard
of the New York Police Department. It was made during the
defendant's arrest at his home. It is the same transcript,
excerpts of which were referred to in the defendant's brief
on appeal in this cause.

 I trust that the above is of assistance to your Honor.

 Respectfully yours,

 Jack L. Cohen

JLC:cas
cc: Joseph I. Stone, Esq.